UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

NATASHIA R.,

                                    Plaintiff,

                                                            3:17-CV-01266
v.
                                                            (TWD)
NANCY A. BERRYHILL
ACTING COMMISSIONER OF SOCIAL SECURITY,

                                    Defendants.
_____

APPEARANCES:                          OF COUNSEL:

LACHMAN & GORTON                      PETER A. GORTON, ESQ.
Counsel for Plaintiff
1500 E. Main Street
P.O. Box 8
Endicott, New York 13761-0089

GRANT C. JAQUITH                      JOANNE PENGELLY, ESQ.
Interim U.S. Attorney for the         Special Assistant U.S. Attorney
Northern District of New York
Counsel for Defendant
Room 218
James T. Foley U.S. Courthouse
Albany, New York 12207

OFFICE OF GENERAL COUNSEL             STEPHEN P. CONTE, ESQ.
Social Security Administration        Chief Counsel, Region II
26 Federal Plaza, Room 3904
New York, New York 10278

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## DECISION AND ORDER

Plaintiff Natashia R. brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial

review of a final decision of the Commissioner of Social Security ("Commissioner") denying her

Title XVI application for Supplemental Security Income ("SSI"). This case has proceeded in accordance with General Order 18 of this Court which sets forth the procedures to be followed when appealing the denial of Social Security benefits. Both parties have filed briefs. Oral argument was not heard. Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States Magistrate Judge. For the reasons discussed below, Plaintiff's motion for judgment on the pleadings (Dkt. No. 10) is denied, and Defendant's motion for judgment on the pleadings (Dkt. No. 11) is granted.

## I.     BACKGROUND AND PROCEDURAL HISTORY

Plaintiff was born in 1985, making her thirty-two years of age on September 2, 2014, when she protectively filed an application for SSI benefits alleging disability beginning on December 21, 2013. (T. 11.[1]) Plaintiff amended her alleged onset date to September 2, 2014, the application date, at the first hearing. (T. 48-49.) She claimed disability due to a learning disability, poor memory and concentration, migraines, bipolar disorder, pain in both hips, right shoulder and right foot, depression, poor sleep, easily annoyed, and history of ten concussions. (T. 68-69.) Plaintiff has a GED and briefly studied graphic design online at the Art Institute of Pittsburgh. (T. 50.) She has no past relevant work, although she did work as a front closer at a McDonald's for three months in 2010 and in housekeeping at a Holiday Inn for a month or two in 2011. (T. 22, 51.)

Plaintiff's application was initially denied on November 13, 2014, and she requested a

---

[1] The Administrative Transcript is found at Dkt. No. 9 Citations to the Administrative Transcript will be referenced as "T," and the Bates-stamped page numbers as set forth therein will be used rather than the page numbers assigned by the Court's CM/ECF electronic filing system.

hearing before an Administrative Law Judge ("ALJ") on December 12, 2014.  (T. 91-93.)  A

hearing on the denial of Plaintiff's SSI application was held before ALJ Elizabeth W. Koennecke

on December 19, 2016, with Plaintiff appearing in Binghamton and the ALJ presiding in

Syracuse.  (T. 44-67.)  Subsequent to the hearing, the ALJ determined that the testimony of a

vocational expert was necessary and held a supplemental video hearing for the testimony of the

vocational expert on April 25. 2016.  (T. 35-43, 146.)

The ALJ determined Plaintiff was not disabled under Section 1614(a)(3)(A) of the Social

Security Act in an April 27, 2016, decision.  (T. 11-23.)  The Appeals Council denied review on

September 22, 2017, making the ALJ's decision the final decision of the Social Security

Administration ("SSA").  (T. 1-3.)

## II.     RELEVANT LEGAL STANDARD

### A.      Standard for Benefits[2]

To be considered disabled, a plaintiff seeking SSI benefits must establish that she or he is

"unable to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which lasted or can be

expected to last for a continuous period of not less than twelve months."  42 U.S.C.

§1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairments [must be] of such severity that he
> is not only unable to do his previous work but cannot, considering
> his age, education, and work experience, engage in any other kind

---

[2]  While SSI has special economic eligibility requirements, the requirements for
establishing disability under Title XVI, 42 U.S.C. § 1382c(a)(3) (SSI) and Title II, 42 U.S.C. §
423(d) (Social Security Disability Insurance) are identical so that "decisions under these sections
are cited interchangeably."  *Donato v. Sec'y of Health and Human Servs.*, 721 F.2d 414, 418 n.3
(2d Cir. 1982) (citation omitted).

> of substantial gainful work which exists in the national economy,
> regardless of whether a specific job vacancy exists for him, or
> whether he would be hired if he applied for work.

*Id*. § 1382c(a)(3)(B).

The Commissioner has established a five-step evaluation process to determine whether an individual is disabled as defined by the Social Security Act. 20 C.F.R. § 416.920. The Supreme Court has recognized the validity of this sequential evaluation process. *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). Under the five-step sequential evaluation process, the decision maker determines:

> (1) whether the claimant is currently engaged in substantial gainful
> activity; (2) whether the claimant has a severe impairment or
> combination of impairments; (3) whether the impairment meets or
> equals the severity of the specified impairments in the Listing of
> Impairments; (4) based on a "residual functional capacity"
> assessment, whether the claimant can perform any of his or her
> past relevant work despite the impairment; and (5) whether there
> are significant numbers of jobs in the national economy that the
> claimant can perform given the claimant's residual functional
> capacity, age, education, and work experience.

*McIntyre v. Colvin,* 758 F.3d 146, 150 (2d Cir. 2014). "If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further." *Barnhart v. Thomas,* 540 U.S. 20, 24 (2003).

The plaintiff-claimant bears the burden of proof regarding the first four steps**.** *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 1996) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)). If the plaintiff-claimant meets his or her burden of proof, the burden of proof shifts to the defendant-Commissioner at the fifth step to prove that the plaintiff-claimant is capable of working. *Id.*

**B.       Standard for Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *Featherly v. Astrue*, 793 F. Supp. 2d 627, 630 (W.D.N.Y. 2011 (citations omitted).  A reviewing court may not affirm the ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

A court's factual review of the Commissioner's final decision is limited to whether there is substantial evidence in the record to support the decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991).  An ALJ must set forth the crucial factors justifying her or his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision.  *Roat v. Barnhart*, 717 F. Supp. 2d 241, 248 (N.D.N.Y. 2010); *Farraris v. Heckler*, 728 F.2d 582, 587 (2d. Cir. 1984).  "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks and citation omitted).  Where evidence is deemed susceptible to more than one rational interpretation, the ALJ's conclusion must be upheld.  *See Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts

from its weight." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). A reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. *Rutherford,* 685 F.2d at 62.

## III.     THE ALJ'S MAY 18, 2017, DECISION

In her May 18, 2017, decision, the ALJ found that Plaintiff had not engaged in substantial gainful employment since September 2, 2014. (T. 14.) The ALJ identified Plaintiff's mental and obesity impairments as severe and determined that Plaintiff did not have an impairment or impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.925 and 416.926). (T. 15.) Specifically, the ALJ considered listings 12.04 (affective disorders), 12.06 (anxiety disorders), 12.08 (personality disorders), and 12.15 (trauma and stress related disorders). *Id*.

The ALJ found that Plaintiff had the residual functional capacity ("RFC"):

> to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant cannot continuously squat but she can frequently do so. The claimant retains the ability to: understand and follow simple instructions and directions; perform simple tasks independently; maintain attention and concentration for simple tasks; regularly attend to a routine and maintain a schedule; relate to and interact appropriately with all others to the extent necessary to carry out simple tasks; and handle simple, repetitive work-related stress in that the claimant can make occasional decisions directly related to the performance of simple tasks in a position with consistent job duties that does not require

the claimant to supervise or manage the work of others.

(T. 17-18.)

The ALJ also determined that Plaintiff had no past relevant work; was defined as a younger individual age 18-49 filer (20 C.F.R. § 416.963); and had at least a high school education and was able to communicate in English. (T. 22.) The ALJ found that transferability of job skills was not an issue because Plaintiff did not have past relevant work, and that considering Plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that she could perform. (T. 22-23.)

## IV. THE PARTIES' CONTENTIONS

In support of her motion for judgment on the pleadings, Plaintiff argues that: (1) the ALJ erred in consistently substituting her own opinions in her RFC determination as to Plaintiff's ability to work consistently over every psychiatric opinion presented to her where the medical opinions all assess moderate or marked impairment in maintaining attention and concentration, relating adequately to others, and maintaining a regular schedule; and (2) the ALJ's Step Five determination was not supported by substantial evidence. (T. 10.) Plaintiff identifies the primary issue in the case as "whether the ALJ attempted to substitute her psychiatric opinion for those of 3 separate psychiatrists given in 4 separate evaluations."[3] *Id.* at 3.

The Commissioner contends that the ALJ properly evaluated the medical evidence of record in determining Plaintiff's RFC, and that her decision, including her Step Five analysis, was supported by substantial evidence. The Commissioner further argues that the ALJ applied

---

[3] Plaintiff is referring to evaluations by three psychologists, Dr. Mary Ann Moore (T. 294-313, 316-22), Dr. T. Inman-Dundon (T. 68-79), and Dr. Christopher J. Yanusas. (T. 367-71.)

the correct legal standards.  (Dkt. No. 11.)

## V.    EVIDENCE INCLUDING MEDICAL RECORDS, EVALUATIONS, OPINIONS, AND HEARING TESTIMONY

Plaintiff has a history of psychiatric issues dating back to at least March of 1996 when she was ten years old and was admitted to Hutchings Psychiatric Center in Syracuse for three days for suicidal ideation.  (T. 230-38.)  Prior to her hospitalization, it was revealed that Plaintiff had been sexually abused by her father for two years.  *Id*. at 231.  The abuse ended in July of 1995 when Plaintiff's mother moved out of the house with her three children.  *Id.* at 231, 237. Plaintiff was diagnosed with adjustment disorder with depressed mood, victim of sexual abuse, phonological disorder, learning disability not otherwise specified ("NOS"), and academic problems during her hospitalization.  *Id*. at 238.  Plaintiff's subsequent psychiatric hospitalizations and mental health treatment are discussed in conjunction with her mental health evaluations.

### A.    Consultative Evaluations by Mary Ann Moore, Psy.D.

Plaintiff was referred to Dr. Moore by the Broome County Department of Social Services and underwent an intelligence evaluation, a Vineland Adaptive Behavior Assessment ("Vineland Assessment"), and a psychiatric evaluation on June 13, 2014.  (T. 294-313.)  On October 23, 2014, Dr. Moore did a second psychiatric evaluation on Plaintiff.  (T.  316-22.)

#### 1.    June 13, 2014, Evaluations

##### a.    Intelligence

Plaintiff reported that she received her GED a year before her class graduated.  (T. 294.) Plaintiff began attending GED classes about the age of 15 or 16 because "[s]he wasn't allowed to

go near Susquehanna Valley High School because [she] went after the vice principal." *Id.* Prior

to being prohibited from attending school, Plaintiff took both regular and special classes. *Id.*

Plaintiff received a full scale IQ of 88 on the WAIS-IV, indicating functioning in the low

average range of intellectual ability. (T. 297.) Plaintiff exhibited borderline skills in abstract

verbal thinking and low average skills in her general fund of information and general work

knowledge. *Id.* She had average skills in visual motor coordination, abstract visual thinking

ability, and visual processing speed. *Id.* Plaintiff's skills in short-term auditory memory and

numerical computation ability were low average. *Id.* Her test scores were indicative of a

learning disorder in regard to verbal processing, and her WRAT-IV scores were not equivalent

with her overall level of intellectual functioning, suggesting a reading disorder. *Id.*

> b.    Vineland Assessment

Plaintiff received the following scores on the Vineland Assessment, Second Edition:

| Area | Standard Score | Age Equivalent |
|------|----------------|----------------|
| COMMUNICATION | 51 | - |
| Receptive Language | 9 | 7.6 |
| Express Language | 10 | 8.7 |
| Written | 10 | 10.0 |
| | | |
| DAILY LIVING SKILLS | 73 | - |
| Personal Living Skills | 10 | 14 |
| Domestic Living Skills | 11 | 13.9 |
| Community Living Skills | 12 | 12.2 |
| | | |
| SOCIALIZATION DOMAIN | 69 | - |
| Interpersonal Relationships | 10 | 10 |
| Play and Leisure Time | 11 | 13 |
| Coping Skills | 11 | 11.6 |

(T. 302.)

According to Dr. Moore, Plaintiff's Adaptive Behavioral Composite score of 62 was suggestive of low functioning in regard to her adaptive behavior. (T. 303.) Significant deficits had to do with communication, more specifically with difficulties in "focusing in regard to being able to listen and successfully maintain attention in regard to conversations and informational talks." (T. 303.) Dr. Moore also concluded that expressive language had to do with similar issues "in regard to pressured speech, problems with complex tasks, and tangential conversations." *Id.* Plaintiff scored moderately low in daily living skills, and all personal, domestic, and community skills, but did indicate the ability to maintain a banking and checking account. *Id.*

Dr. Moore noted "difficulties with criticism . . . in regard to job and problems with maintaining household daily skills on a consistent basis, including cooking and cleaning, as well as personal skills, such as taking medication on a daily basis in a proper manner." *Id.* Plaintiff was also found to exhibit deficits in regard to socialization, including getting along with others, seeing others on a regular basis, having problems with maintaining friendships, and problems with impulsivity and coping skills. *Id.*

c.    Psychiatric Evaluation

By way of background, Plaintiff reported to Dr. Moore that she had been psychiatrically hospitalized when she threatened the vice-principal and was told she "was bipolar, had split personality, anxiety, and ADHD."[4] (T. 306.) She was placed on Paxil around that time and "tried to kill [her] family" while taking it. (T. 307.) Plaintiff explained to Dr. Moore that she

_____

[4] According to Plaintiff, she was sent to Hutchings Psychiatric Center for three months when she was sixteen because of the things she said when she finally started opening up with her counselor. (T. 451.) The experience left her "not trusting" counselors. (T. 451.)

"was very violent as a kid." *Id.* Plaintiff described having attempted to set the barn on fire with her sister and brother inside, and explained that "the damn lighter wouldn't start, but I guess that's a good thing." *Id.* Plaintiff then commented that she really would have liked to kill her brother, and admitted having tazed him when she became frustrated with him two years ago. (T. 307-08.) Plaintiff indicated she suffered from increased depression when she had her children and believes she was placed on an antidepressant. *Id.* Plaintiff had been court ordered to go to Broome County Mental Health five years ago but could not remember whom she had seen.[5] *Id.* At the time of Dr. Moore's evaluation, Plaintiff had not received psychiatric or psychological treatment in several years. *Id.*

Plaintiff reported that she did not believe her memory and concentration were good, and that she always had a hard time with focusing and paying attention, being disorganized, and remaining still. (T. 309.) She tried to write things in notebooks or random pieces of paper and would lose the notebooks and the paper. *Id.*

According to Dr. Moore's report on Plaintiff's mental status examination, Plaintiff was generally cooperative in responding to questions and her manner of relating socially was adequate. (T. 310.) Her posture was slouched, her motor behavior was restless, and her eye contact was appropriate. *Id.* Dr. Moore found no significant problems with Plaintiff's speech, thought processes, affect, sensorium, and orientation. *Id.* Plaintiff's mood was euthymic, although she would occasionally laugh at inappropriate topics such as trying to kill her brother and sister and tazing her brother. *Id.*

---

[5] Plaintiff was ordered by the court to go to counseling when her children's father and/or paternal grandparents commenced a neglect proceeding which, according to Plaintiff, was determined to be unfounded after investigation and the case closed. (T. 295, 451.)

Dr. Moore found Plaintiff's attention and concentration to be impaired, perhaps due to ADHD. *Id*. Plaintiff was able to count and do simple calculations, and serial threes with some difficulty. *Id*. Plaintiff's recent and remote memory skills were found to be mildly impaired, and her cognitive function was found to be in the low average range with weaker borderline verbal skills and average performance skills. (T. 311.) Her general fund of information was appropriate to experience. *Id*. Her insight appeared fair to poor, and her judgment also appeared fair to poor with continued mood swings noted. *Id*.

Plaintiff reported that she tried to do some cooking, cleaning, and laundry but lacked motivation. *Id*. She indicated she had few friends and was withdrawn and untrusting of others. *Id*. She had no hobbies or current interests and generally spent her days getting her children off to school, trying to do some light household chores, and listening to music or watching television. *Id*.

Dr. Moore found that Plaintiff showed no limitation in regard to following and understanding simple directions and instructions and performing rote tasks independently. *Id*. Plaintiff was found to have moderate limitation in regard to maintaining attention and concentration, learning new tasks, and performing complex tasks independently; more marked when tasks are more verbally oriented. *Id*. Dr. Moore concluded that Plaintiff showed marked limitation in regard to appropriately dealing with stress and relating adequately to others, and moderate limitation in regard to making appropriate work decisions and maintaining a regular work schedule. *Id*.

Dr. Moore concluded that "[t]he results of the examination appear to be consistent with psychiatric and learning issues that may significantly interfere with the client's ability to function

on a daily basis." (T. 312.) Dr. Moore diagnosed Plaintiff with Bipolar II disorder with psychotic features; learning disabilities, NOS with auditory processing difficulties; reading disorder; arithmetic disorder; ADHD, combined type; cannabis abuse in early remission; and rule out post traumatic stress disorder and panic disorder. *Id.*

Dr. Moore highly recommended that Plaintiff receive persistent psychiatric and psychological treatment and possible substance abuse treatment or aftercare. *Id.* Plaintiff's prognosis at the current time was described as fair to guarded, and she was found to continue to exhibit mood swings with anger issues. *Id.*

### 2. October 23, 2014, Psychiatric Evaluation

At the time of Dr. Moore's second psychiatric evaluation, Plaintiff was not receiving counseling or on any psychiatric medication. (T. 317.) Plaintiff reported that in the past, she had been on Ativan, Zoloft, Prozac, Effexor, Paxil, Celexa, and other medications she could not remember. (T. 316.)

Plaintiff reported having had feelings of depression since she was a child, reporting that her father had sexually abused her and made her watch pornography. (T. 317.) She talked about sadness, crying spells, hopelessness, and irritability. *Id.* However, Plaintiff did indicate that she felt she had matured somewhat as an adult and especially with children, and the verbal and physical aggression that had occurred in the past was not occurring. *Id.* Plaintiff reported panic attacks, palpitations, sweating, breathing difficulties, trembling, and chest pain occurring several times a week. (T. 318.) The last one had occurred about four days ago waiting for her appointment with Dr. Moore. *Id.*

Plaintiff's mental status examination results were largely the same as on June 13, 2014,

except that Plaintiff's eye contact was poor in the second exam, and her insight was fair. (T. 320.) On October 23, 2014, Plaintiff was found to have only mild limitations in regard to maintaining attention and concentration whereas on June 13, 2014, she was found to have moderate limitations. (T. 311, 320.) Plaintiff was found to show moderate to marked limitation in regard to appropriately dealing with stress and relating to others, as opposed to the marked limitation found on June 13, 2014. (T. 297-98, 320.)

Dr. Moore again found the results of the examination appeared consistent with psychiatric and learning issues that might significantly interfere with her ability to function on a daily basis. (T. 321.) Plaintiff was diagnosed with bipolar II disorder with psychotic features; post traumatic stress disorder; panic disorder, without agoraphobia; prescription drug abuse in remission; rule out personality disorder, NOS, with borderline features; and ADHD, combined type. *Id.* Dr. Moore continued to recommend that Plaintiff receive consistent psychiatric and psychological treatment, and Plaintiff's prognosis was described as fair to guarded with lack of treatment. *Id.*

### B. Non-Examining Review Consultant T. Inman-Dundon, PhD.

Non-examining state agency psychologist, T. Inman-Dundon, Ph.D., completed the initial level Psychiatric Review Technique ("PRT") on Plaintiff on November 12, 2014. (T. 68-72.) Dr. Inman-Dundon found Plaintiff to have a mild restriction on activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace. (T. 72.) Inman-Dundon determined that Plaintiff's statements about the intensity, persistence, and functionally limiting effects of the symptoms were substantiated by the objective medical evidence alone. (T. 73.)

Dr. Inman-Dundon found that Plaintiff's ability to carry out very short and simple

instructions; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to work in coordination with or in proximity to others without being distracted by them; and to make simple work-related decisions were not significantly limited. *Id.*

Dr. Inman-Dundon also found, however, that Plaintiff has sustained concentration and persistence limitations that moderately limited her ability to carry out detailed instructions; to maintain attention and concentration for extended period; to complete a normal workday and work week without interruptions from psychologically based symptoms; and to perform at a consistent pace without an unreasonable number and length of rest periods. (T. 75-76.)

Dr. Inman-Dundon also found that Plaintiff had social interaction limitations. (T. 76.) She found that Plaintiff was not significantly limited in the ability to ask simple questions or request assistance or to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. *Id.* However, Inman-Dundon found that Plaintiff had moderate limitations in her ability to act with the general public; accept instructions and respond appropriately to criticism from supervisors; and ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. *Id.* Plaintiff was also found to have adaptive limitations, including a moderate limitation on her ability to respond appropriately to changes in the work setting and the ability to set realistic goals or make plans independently of others. *Id.* Dr. Inman-Dundon determined that Plaintiff was not disabled. (T. 78.)

## C.      Psychologist Christopher J. Yanusas, Ph.D.

Plaintiff was referred to Dr. Yanusas for a neuropsychological evaluation and treatment by her psychiatrist. (T. 367.) Yanusas saw Plaintiff in October and November of 2016 and his

report is dated November 29, 2016. (T. 367-71.) Yanusas noted that Plaintiff was being seen for counseling and psychiatric management at Lourdes Hospital for anxiety, mood-related issues, auditory and visual hallucinations, and dissociative symptoms. (T. 367.)

Plaintiff was found to demonstrate adequate skills in orientation; cooperative social interactions; expressive/receptive language for conversations; average visual memory; higher level problem solving involving analogic, sequential, inductive and deductive reasoning skill when concentration is controlled; and adequate insight and judgment about limitations. (T. 369-70.)

Plaintiff's weaknesses were listed as including clinically significant symptoms of depression and anxiety, with her depression symptoms rated as moderate with reported problems with depressed mood, and difficulty concentrating and making decisions. (T. 370.) Plaintiff was reported by Dr. Yanusas as feeling that she required moderate assistance to complete routine activities of daily living, with moderate assistance defined as "needing 50% or more help to complete a task." *Id*. Plaintiff was found to require moderate assistance to complete activities of daily living; to demonstrate weakness in complex attention, including concentration and sustained attention, which negatively impacted her ability to learn novel information; and weakness recent memory for verbal information. *Id*.

### D.    Nicole Babcock, MSW

Plaintiff began attending counseling with Nicole Babcock, MSW, in March of 2015. (T. 373-426.) The reasons for seeking services included anger, anxiety, depression, trouble sleeping, and history of trauma. (T. 373.) In her initial mental status exam in March of 2015, Plaintiff was found to be oriented X4 and to have good eye contact; a guarded attitude; fair judgment; a calm

16

psychiatric mood; guarded affect; fair insight; fair concentration; unimpaired memory; logical, clear thought content; no delusions; perception depersonalized; and auditory, olfactory, and visual hallucinations. (T. 382.)

Plaintiff had not been in psychiatric treatment for eight years as of February 2015 and was referred to Ms. Babcock at the recommendation of her Department of Social Services ("DSS") case worker, who was helping Plaintiff apply for SSI. (T. 374, 383.) According to Ms. Babcock's notes, Plaintiff indicated she was primarily requesting an evaluation for purposes of supporting her application for SSI and was ambivalent about engaging in treatment or taking psychiatric medication. (T. 383.) However, Plaintiff expressed a desire to change, and her engagement in sessions improved during each of her three intake sessions. *Id*. Plaintiff was seeing Ms. Babcock at the time of her hearing on December 19, 2016, although the records indicate there was a gap in treatment when Plaintiff was discharged on April 10, 2015, for failing to show up for appointments subsequent to having been required by Ms. Babcock to go to the comprehensive psychiatric emergency room for an evaluation due to suicidal statements. (T. 387, 448.) Plaintiff's updated narrative in a December 8, 2015, readmission assessment, indicates Plaintiff stated "I need help getting into reality," and reported that welfare to work was mandating treatment, and her SSI appeal was in process. (T. 56-57, 383.) Plaintiff's stated goal, as a part of her treatment plan starting January 8, 2016, was "I'd like to get off of welfare. I want to get a good paying, easy job." (T. 391.) An objective set with a target date of April 15, 2016, was for Plaintiff to get connected with a job coach through ACCESS VR to help her pursue employment. *Id.*

**E.      Plaintiff's Hearing Testimony**

Plaintiff testified that her last employment had been in housekeeping at a Holiday Inn in 2011, and that her employment had been terminated after a month or two because her employer saw her limping and was afraid she would file a worker's compensation claim.  (T. 51.) According to Plaintiff, since she was terminated, she has applied for employment at Burger King, McDonald's, Wendy's, Denny's, CVS, Save-a-Lot, Aldi's, Olum's, Walmart, and Price Chopper, but no one would hire her when she told them of her hip problem. (T. 52.)

Plaintiff testified she lived with her son and daughter, a dog, and three cats, she was single, welfare paid her rent and utilities, and she received $400 in food stamps per month.  (T. 61.)  According to Plaintiff, after she put her children, eleven and twelve, on the school bus, all she wanted to do was lie down, although falling asleep had been a problem for as long as she could remember.  (T. 61-62.)  Plaintiff walked to Save-a-Lot for light shopping and had her mother take her for heavy shopping.  (T. 62.)  Her mother also took her and her son, who has anger management problems, to therapy every two weeks.  (T. 62-63.)  Plaintiff cooked meals, did dishes with her children's help, did laundry for herself and her children, vacuumed, swept, and mopped when she could.  (T. 63.)  Plaintiff's children helped with mopping, sweeping, dishes, dusting, feeding the cats, taking care of the animals, and putting their clothes away after she laundered and folded them.  *Id.*  While Plaintiff had a driver's permit, she could not get a license because she had a tendency to freak out behind the wheel.  (T. 65.)  Plaintiff claimed to never leave home to go for a walk or go visit a friend.  (T. 64.)  She stayed home and watched a movie and played with the cats and dog if she had nothing else to do.  *Id.*  Plaintiff testified that

DSS used to take her to a "job thing" but stopped when they thought she was having a panic attack one day, which she denied, and put her in therapy.  (T. 66-67.)

F.    **Hearing Testimony of Vocational Expert Guy Hostetler**

The relevant portion of the hypothetical presented to Mr. Hostetler by the ALJ was:

> I want you to consider a 31-year old individual with a GED, no past relevant work. . . . They retain the ability to understand, follow simple instructions and directions, so I'll say no constants.  Can be so no continuous.  Can be frequent.  The Claimant retains the person retains the ability to understand and follow simple instructions and directions; perform simple tasks independently, maintain attention and concentration for simple tasks, regularly attend to routine and making the schedule, relate to and interact appropriately with all others to the extent necessary to carry out simple tasks, handle simple repetitive free of stress and that can make occasional decisions directly related to simple tasks in a position with consistent job that does no require the [INAUDIBLE] work of others.  Are there any jobs a person that I described could do?

(T. 42-43.)  Mr. Hostetler testified that Plaintiff could be a cleaner, housekeeper, garment sorter, and presser machine operator.  (T. 43-44.)  Plaintiff's counsel asked how a person's occupational base would be affected if the person in addition to the existing limitations could only maintain attention and concentration frequently and would be off task one-third of the time.  (T. 44-45.)  Mr. Hostetler responded that would be preclusive to employment.  (T. 45.)

VI.   **ANALYSIS**

A.    **Residual Functional Capacity**

A claimant's RFC is the most she can do despite her limitations.  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  "Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and

the RFC assessment must include a discussion of the individual's abilities on that basis. A regular and continuing basis means eight hours a day, for five days a week, or an equivalent work schedule." *Pardee v. Astrue*, 631 F.Supp.2d 200, 210 (N.D.N.Y. 2009) (citing *Melville v. Apfel*, 198 F.3d 45, 42 (2d Cir. 1999) (internal quotation marks omitted)).

It is the ALJ's job to determine a claimant's RFC, and not to simply agree with a physician's opinion. 20 C.F.R. §416.946(c). In assessing a claimant's RFC, the ALJ must consider "all of the relevant medical and other evidence." *Id.* § 416.945(a)(3)-(4). In formulating the claimant's RFC, the ALJ will afford weight to the medical opinion evidence in the record. The relevant factors considered in determining what weight to afford an opinion include the length, nature and extent of the treatment relationship, relevant evidence which supports the opinion, the consistency of the opinion with the record as a whole, and the specialization (if any) of the opinion's source. 20 C.F.R. § 404.1527(c)(1)-(6). The RFC must be supported by substantial evidence in the record. *See* 42 U.S.C. § 405(g). "Ultimately, '[a]ny impairment-related limitation created by an individual's response to demands of work . . . must be reflected in the RFC assessment.'" *Hendrickson v. Astrue*, No. 11-CV-0927 (ESH), 2012 WL 7784156, at *3 (N.D.N.Y. Dec. 11, 2012) (quoting SSR 85-15, 1985 WL 56857, at *8).

The ALJ must "'carefully consider'" all the evidence presented by claimants regarding their symptoms, which fall into seven relevant factors including 'daily activities' and the 'location, duration, frequency, and intensity of [their] pain or other symptoms.'" *Del Carmen Fernandez v. Berryhill*, No. 18-CV-326, 2019 WL 667743, at *9 (S.D.N.Y. Feb. 19, 2019) (citing 20 C.F.R. § 416.929(c); Social Security Ruling (SSR) 16-3p, *Titles II and XVI: Evaluation of Symptoms in Disability Claims*, 81 FR 14166-01 at 14169-70, 2016 WL 1020935

(Mar. 16, 2016)).[6]

In SSR 16-3p, 81 FR at 14167, the Commissioner eliminated the use of the term "credibility" from the "sub-regulatory policy" because the regulations themselves do not use that term. Instead, symptom evaluation tracks the language of the regulations.[7] The evaluation of symptoms involves a two-step process. First, the ALJ must determine, based upon the objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged . . . ." 20 C.F.R. § 416.929(a), (b).

If so, at the second step, the ALJ must consider "'the extent to which [the claimant's] alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the [objective medical evidence] and other evidence to decide how [the claimant's] symptoms affect [her] ability to work.'" *Barry v. Colvin*, 606 F. App'x 621, 623 (2d Cir. 2015) (citing inter alia 20 C.F.R. § 404.1529(a)); *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (alterations in original).

"[O]nce an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to

---

[6] The SSR was republished on October 25, 2017 at 2017 WL 5180304, which changed the terminology from "effective date" to applicable date, and made the SSR applicable to all determinations and decisions on or after March 26, 2016. 2017 WL 5180304, at *13. The Ruling was otherwise unchanged.

[7] The standard for evaluating subjective symptoms has not changed in the regulations. Rather, in making determinations and decisions, the term "credibility" is no longer to be used, and SSR 16-3p makes it clear that the evaluation of the claimant's symptoms is not "an evaluation of the claimant's character." 81 FR at 14167. The court will remain consistent with the terms as used by the Commissioner.

determine the extent to which the symptoms limit the individual's ability to do basic work activities." SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

The ALJ must provide specific reasons for the determination. *Cichocki v. Astrue*, 534 F. App'x 71, 76 (2d Cir. 2013). However, the failure to specifically reference a particular relevant factor does not undermine the ALJ's assessment as long as there is substantial evidence supporting the determination. *Id. See also Del Carmen Fernandez,* 2019 WL 667743 at *11 (citing *Rousey v. Comm'r of Soc. Sec.*, 285 F. Supp. 3d 723, 744 (S.D.N.Y. 2018)). "[R]emand is not required where 'the evidence of record allows the court to glean the rationale of an ALJ's decision.'" *Cichocki,* 534 F. App'x at 76 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)).

The RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations. *Whittaker v. Comm'r of Soc. Sec.*, 307 F. Supp. 2d 430, 440 (N.D.N.Y. 2004) (citation omitted). Each finding must be considered separately and the ALJ must specify the functions plaintiff is capable of performing; conclusory statements regarding plaintiff's capacities are not sufficient. *Roat v. Barnhart*, 717 F. Supp. 2d 241, 267 (N.D.N.Y. 2010) (citation omitted); SSR 96-8p, 1996 WL 374184, at *5 (S.S.A. July 2, 1996). Each assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and non-medical evidence. SSR 96-8p. "RFC is then used to determine the particular types of work a claimant may be able to perform." *Whittaker*, 307 F. Supp. 2d at 440. RFC may then be expressed in terms of the exertional levels (sedentary, light, etc.) to determine the particular types of work a claimant may be able to perform. *Id*.

The Second Circuit has found that failure to specify the basis for a conclusion as to RFC

is reason enough to vacate a decision of the Commissioner. *White v. Sec'y of Health & Human Servs.*, 910 F.2d 64, 65 (2d Cir. 1990) (stating that because the Secretary failed to articulate the basis for the findings as to claimant's residual functional capacity, the court vacates and remands). Moreover, remand is appropriate where the court is unable to fathom the Commissioner's rationale in relation to the evidence in the record without further findings or explanation for the decision. *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996).

**B**. **Challenge to ALJ's RFC Assessment Regarding Plaintiff's Ability to Maintain Attention and Concentration, Relate Adequately to Others, and Maintain a Regular Schedule**

As noted above, the ALJ found that Plaintiff had the RFC

> to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant cannot continuously squat but she can frequently do so. The claimant retains the ability to: understand and follow simple instructions and directions; perform simple tasks independently; maintain attention and concentration for simple tasks; regularly attend to a routine and maintain a schedule; relate to and interact appropriately with all others to the extent necessary to carry out simple tasks; and handle simple, repetitive work-related stress in that the claimant can make occasional decisions directly related to the performance of simple tasks in a position with consistent job duties that does not require the claimant to supervise or manage the work of others.

(T. 17-18.) Plaintiff contends that in determining the RFC, the ALJ erroneously submitted her own opinions over the medical opinions of psychologists Dr. Moore, Dr. Inman-Dundon, and Dr. Yanusas, who had all assessed Plaintiff as having moderate or marked impairments in maintaining attention and concentration, relating adequately to others, and maintaining a regular schedule.[5] (T. 10.) For reasons explained below, the Court finds that the ALJ applied the proper

---

[5] *See Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) ("While an ALJ is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical

legal standards with regard to Plaintiff's RFC, and that there is substantial support in the record for the RFC.

## 1.    Maintaining Attention and Concentration

In her RFC analysis, the ALJ acknowledged Dr. Inman-Dundon's determination that Plaintiff had moderate limitations in her ability to maintain attention and concentration for extended periods of time.  (T. 21.)  The ALJ gave significant weight to Dr. Inman-Dundon's opinion because she "has program as well as professional expertise and her findings are consistent with the longitudinal record."  *Id*.  The ALJ concluded that Dr. Inman-Dundon's findings on Plaintiff's limitations were "consistent with her ability to perform simple work in a low contact, low stress environment such as that contemplated by the residual functional capacity."  *Id*.

The ALJ noted that in her June 2014 evaluation of Plaintiff, Dr. Moore, like Dr. Inman-Dundon, determined Plaintiff had a moderate limitation maintaining attention and concentration.  (T. 21, 311.)  However, in her October of 2014 evaluation of Plaintiff, Dr. Moore found that Plaintiff had only a mild limitation in maintaining attention and concentration.  (T. 21, 320.)  The ALJ also gave significant weight to Dr. Moore's opinion to the extent her findings were consistent with the longitudinal record because Dr. Moore had the opportunity to examine Plaintiff on more than one occasion and had professional expertise.  *Id*.  The ALJ concluded that the RFC reflected the moderate restrictions identified by Dr. Moore.  *Id*.

In his November of 2016 neuropsychological evaluation of Plaintiff, Dr. Yanusas found

opinions, he is not free to set his own experience against that of a physician who submitted an opinion or testified to him.") (citation and internal quotation marks and punctuation omitted).

that she demonstrated weakness in "complex attention, including concentration and sustained attention," and that "[h]er problems with complex attention negatively impacted her ability to learn novel information." (T. 349.) Dr. Yanusas also found that Plaintiff's "performance was mediated by anxiety that affected her concentration at times." (T. 347.) The ALJ gave great weight to Dr. Yanusas's opinion because he had an opportunity to examine Plaintiff and his findings were consistent with and supported by the longitudinal record. (T. 22.) The ALJ concluded that "[t]he residual functional capacity precludes complex tasks and reflects a restriction to rote tasks, which would not require the claimant to learn anything novel or remember much." *Id.*

The ALJ incorporated Plaintiff's impairment in maintaining attention and concentration in the RFC by stating that she had the capacity to maintain attention and concentration for simple tasks. (T. 17-18.) "[C]ourts [in the Second Circuit] have routinely held that individuals suffering from 'moderate' difficulties with memory, concentration, and handling stress could reasonably be found to have the residual functional capacity to perform 'simple, routine and repetitive tasks." *Worthy v. Berryhill*, No. 3:15-CV-1762 (SRU), 2017 WL 1138128, at *7 (D. Conn. Mar. 27, 2017). *See, e.g.*, *Smith v. Colvin*, No. 3:14-CV-1752 (SRU), 2016 WL 1170910, at *6 (D. Conn. Mar. 23, 2016) ("when medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace, limiting claimant to only unskilled work sufficiently accounts for such limitations") (citation omitted); *Steffens v. Colvin*, No. 6:14-CV-06727 (MAT), 2015 WL 9217058, at *4 (W.D.N.Y. Dec. 16, 2015) ("[W]hen medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in

25

concentration, persistence, and pace, courts have concluded that limiting the hypothetical to include only unskilled work sufficiently accounts for such limitations.") (citation and internal quotation marks omitted).

Plaintiff has cited circuit court decisions from other circuits in support of her argument that an ALJ does not account for limitations in concentration, persistence, and pace by restricting the hypothetical to simple, routine tasks or unskilled work. *See, e.g., Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011); *Stewart v. Astrue*, 561 F.3d 679, 685 (7th Cir. 2009).

In *Bartell v. Comm'r of Soc. Sec.*, No. 13-CV-0843, 2014 WL 4966149, at *3 (N.D.N.Y. Sept. 30, 2014)*,* the district court noted that "[t]he Second Circuit has not directly addressed the issue of whether a limitation to simple unskilled work adequately counts for moderate limitations in concentration, persistence, and pace." The Court in *Bartell* found the ALJ's RFC assessment limiting plaintiff to simple unskilled work was consistent with (1) the ALJ's determination that plaintiff had moderate difficulties of concentration, persistence, and pace; and (2) a medical opinion indicating that despite limitations, plaintiff could perform the basic activities of unskilled work. *Id*.

 In *McIntyre,* 758 F.3d at 152, the Second Circuit did address the failure to incorporate the non-exertional limitation in concentration, persistence, and pace in a hypothetical given a vocational expert and held that "the ALJ's failure to incorporate non-exertional limitations in a hypothetical (that is otherwise supported by evidence in the record) is harmless error if . . . 'medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace,' and the challenged hypothetical is limited 'to include only unskilled work'." The Court determined that "substantial evidence in

the record demonstrate[d] that McIntyre [could] engage in simple, routine, low stress tasks notwithstanding her physical limitations in concentration, persistence, or pace." *Id*.

The Court finds that the ALJ applied the proper legal standards in addressing Plaintiff's impairment in maintaining attention and concentration in the RFC, and that there is substantial evidence in the record supporting the RFC in that regard. First, the Court notes that while Dr. Moore found Plaintiff to have moderate limitations in maintaining attention and concentration on June 13, 2014 and Dr. Inman-Dundon made the same finding on November 12, 2014, Dr. Moore found a mild impairment in her subsequent psychiatric evaluation on October 23, 2014.[6] (T. 75-76, 311, 320.) Furthermore, in his November 29, 2016, report, Dr. Yanusas found Plaintiff had weaknesses in "complex attention," which included concentration and sustained attention, and that her problems with complex attention would negatively impact her ability to learn novel information. (T. 349.) Dr. Yanusas did not opine that Plaintiff would have significant attention and concentration problems with simple tasks.

Second, the Court finds there is substantial evidence in the record supporting Plaintiff's ability to engage in simple tasks notwithstanding what the medical evidence has described as a mild to moderate impairment in maintaining attention and concentration and weaknesses in complex attention. IQ and other testing done by Dr. Moore indicated Plaintiff was functioning in the low average range and likely had a learning disorder in regard to verbal processing. (T. 297.) Nonetheless, Dr. Moore found that Plaintiff had no limitation with regard to following and

---

[6] In her Step Three evaluation, the ALJ, based largely on her analysis of Dr. Moore and Dr. Inman-Dundon's assessments of Plaintiff, found that she had "no more than a mild limitation in concentrating, persisting, or maintaining pace." (T. 17.) Her determination finds support in Dr. Moore's October 23, 2014, psychiatric evaluation of Plaintiff. (T. 320.)

understanding simple directions and instructions and performing simple rote tasks independently. *Id.*

Dr. Inman-Dundon determined that although Plaintiff had understanding and memory limitations, she was not significantly limited in the ability to remember work-like procedures and to understand and remember very short and simple instructions. (T. 75.) Dr. Inman-Dundon also determined that despite Plaintiff's sustained concentration and persistence limitations, her abilities to carry out very short and simple instructions, to sustain an ordinary routine with special supervision, make simple work-related decisions, and to ask simple questions or request assistance were not significantly limited. (T. 75-76.) Based upon her review of Plaintiff's records, Dr. Inman-Dundon concluded Plaintiff was not disabled. (T. 78.)

While Dr. Yanusas determined that Plaintiff's general abilities fell in the below average range and her working memory for verbal and nonverbal information fell in the well below average range, he found that Plaintiff was able to follow complex commands, and that her ability to answer previously learned questions and recall novel information was average. (T. 347-48.) Dr. Yanusas also found that Plaintiff had adequate skills for expressive/receptive language for conversations, average visual memory, higher level problem solving involving analogic, sequential, inductive and deductive reasoning skills when concentration was controlled, and adequate insight and judgment about limitations. (T. 348-49.) As noted above, Dr. Yanusas found weakness in complex attention, including concentration and sustained attention, but noted only that it negatively impacted her ability to learn novel information. (T. 349.)

Based on the foregoing, the Court concludes that there is substantial evidence in the record supporting the ALJ's determination that Plaintiff can perform simple tasks with a

moderate limitation in attention and concentration.

2.   <u>Maintaining a Regular Schedule</u>

Based on her review of Plaintiff's records, Dr. Inman-Dundon determined that Plaintiff's ability "to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances" was not significantly limited.[7] (T. 75.) Dr. Inman-Dundon also found that Plaintiff's ability to complete a normal workday and workweek without interruptions from psychologically based symptoms was moderately limited. (T. 76.) The ALJ gave significant weight to Dr. Inman-Dundon's opinions. (T. 21.)

In June of 2014, Dr. Moore found that Plaintiff had a moderate limitation in maintaining a regular work schedule. (T. 311.) Dr. Moore concluded that "[t]he results of the examination appear to be consistent with psychiatric and learning issues that may significantly interfere with the client's ability to function on a daily basis." (T. 312.) In her October of 2014 evaluation, Dr. Moore found Plaintiff to have moderate to marked limitations in maintaining a regular work schedule. (T. 320-21.) The ALJ gave significant weight to Dr. Moore's opinions and concluded that the RFC reflected Dr. Moore's moderate restrictions. (T. 21.)

In addition to relying on the finding by Dr. Inman-Dundon that Plaintiff was not significantly limited in her ability maintain regular attendance, the ALJ identified substantial evidence in the record supporting that Plaintiff had the ability to maintain a regular work schedule thus supporting the RFC.[8] *See Barry,* 606 F. App'x at 624 (finding that despite finding

---

[7] In her Brief, Plaintiff erroneously states that Dr. Inman-Dundon found she had a moderate limitation in maintaining a schedule. (Dkt. No. 10 at 14.)

[8] The ALJ may rely upon the opinions of both examining and non-examining state agency medical consultants because they are qualified experts in the field of social security

in a medical source statement by a consulting physician that plaintiff could not maintain a regular schedule, the conclusion of a state agency psychologist that plaintiff had no significant limitations in "performing activities within a schedule, maintaining regular attendance, or being punctual within customary tolerances," along with substantial evidence from the record and plaintiff's statements about her symptoms and limitations, supported the challenged RFC).

The ALJ noted that Plaintiff's housekeeping job at the Holiday Inn was going well and ended due to her physical complaints. (T. 19.) The Court notes that Plaintiff had continued seeking employment after losing her job at the Holiday Inn and was unsuccessful because of her hip problem rather than any issue with her performance. (T. 52.)

The ALJ also considered Plaintiff's acknowledgment to Ms. Babcock that she had sought psychiatric treatment primarily to assist her in obtaining SSI, as she was ambivalent about engaging in mental health treatment. (T. 18-19, 383.) During treatment with Ms. Babcock, Plaintiff expressed a desire to change, and it was part of her treatment goal to get off welfare and get a good paying job, which indicated to the ALJ that Plaintiff had a capacity for and an interest in working. (T. 19, 391, 467-68.) In fact, Ms. Babcock's treatment notes identify getting Plaintiff connected with a job coach at ACCESS VR to help her pursue employment as one of Plaintiff's objectives, with a target date of April 15, 2016. (T. 468.)

At her hearing, Plaintiff testified that she put her children on the school bus on a regular basis, cooked meals, did dishes with help from her children, did laundry for the family, vacuumed, swept, and mopped when she could. (T. 61-63.) The ALJ considered that when it

---

disability. *See Frey ex. rel A.O. v. Astrue*, 485 F. App'x 484, 487 (2d Cir. 2012) (summary order).

came to her children, Plaintiff was able to do what needed to be done in spite of her mental health symptoms, suggesting that with proper motivation, Plaintiff was capable of being more active than alleged.  (T. 19.)

Based on the foregoing, the Court concludes that there is substantial evidence in the record supporting the ALJ's determination that Plaintiff retains the ability to regularly maintain a schedule.

### 3.    Relating Adequately to Others

The ALJ concluded that Plaintiff had the RFC "to relate to and interact appropriately with all others to the extent necessary to carry out simple tasks."  (T. 18.)  The ALJ gave significant weight to Dr. Inman-Dundon's opinion that Plaintiff had moderate limitations in her ability to "interact with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers/peers without distracting them or exhibiting behavioral extremes."  (T. 21, 76.)  The ALJ concluded that Dr. Inman-Dundon's limitations involving Plaintiff's ability to relate to others, were "consistent with the ability to perform simple work in a low contact, low stress environment, such as that contemplated by the residual functional capacity."  (T. 21.)

The ALJ also referenced Dr. Moore's June of 2014 evaluation of Plaintiff in which she had found Plaintiff had marked limitations in relating adequately to others and her October of 2014 evaluation where she found moderate to marked limitations in regard to relating adequately to others.  (T. 21, 297-98, 320-21.)  The ALJ gave significant weight to Dr. Moore's opinions and, as she had with Dr. Inman-Dundon, concluded that the RFC reflected the moderate restrictions found by Dr. Moore in her October of 2014 evaluation.  (T. 21.)

Plaintiff contends that the opinions indicating moderate to marked limitations in relating adequately to others were uncontradicted and should have been included in the RFC. (Dkt. No. 10 at 20-21.) An ALJ's RFC finding need not "perfectly correspond with" any medical source statement. *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013). Rather, an ALJ is "entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole." *Id. See also Uriah v. Comm'r Soc. Sec.*, No. 6:16-CV-1006 (GTS), 2017 WL 4326066, at *9 (N.D.N.Y. Sept. 27, 2017) ("[A]n ALJ is not required to rely on a medical opinion when making his determination, as the sole responsibility for determining a claimant's RFC is on the ALJ, which is based on an evaluation of all the medical evidence and other evidence in the record.") (collecting cases).

In fact, the ALJ did not completely disregard the opinions of Dr. Inman-Dundon and Dr. Moore with regard to Plaintiff's ability to relate adequately to others as Plaintiff seems to suggest. (Dkt. No. 10 at 20-21.) As noted in Defendant's Brief, the ALJ did account for some limitations in this area based on those opinions, while also considering the evidence showing that Plaintiff was able to interact with others, in finding that Plaintiff had the ability to relate to others to the extent necessary to carry out simple tasks in a low stress environment. (Dkt. No. 11 at 13.)

The ALJ noted that Plaintiff was able to take care of her children and had considerable patience with them. (T. 18, 59.) She also took into consideration that Plaintiff had a boyfriend and was pregnant, and they were both happy, suggesting at least some social contacts. (T. 19, 427, 434.) The ALJ considered as well the Plaintiff's denial that her past behavior regarding serious attempts at homicide continued to be an issue after she had children. (T. 19.) In addition, the Court also notes that Plaintiff told Dr. Moore at one point that she had a few friends, although

she subsequently claimed only one friend, and that she walked to Save-a-Lot for light shopping where she would have to interact with others on a regular basis. (T. 16.) As previously noted, Plaintiff's housekeeping job at the Holiday Inn was going well from a mental health perspective and ended due to physical complaints. (T. 19.)

## C.    THE ALJ'S STEP FIVE DETERMINATION

Plaintiff challenges the ALJ's Step Five determination that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (T. 23; Dkt. No. 10 at 21-22.) "An ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as 'there is substantial record evidence to support the assumption[s] upon which the vocational expert based his opinion,' and accurately reflect the limitations and capabilities of the claimant involved." *McIntyre*, 758 F. 3d at 151 (alteration in original) (citation omitted). Plaintiff claims that the ALJ gave the vocational expert ("VE") a hypothetical based upon an RFC that did not accurately reflect the true extent of Plaintiff's limitations, thereby rendering his testimony unreliable and unable to constitute substantial evidence to support the ALJ's Step Five determination. (Dkt. No. 10 at 21-22.)

The Court has found that the RFC was supported by substantial evidence and, therefore, rejects Plaintiff's Step Five assertion that the VE's testimony was unreliable and could not constitute substantial evidence based upon the inadequacy of the RFC. *See Tiffany C. v. Com'r of Soc. Sec.*, No. 5:17-CV-878 (FJS/DJS), 2018 WL 4610676, at *6 (N.D.N.Y. June 20, 2018) ("Where, as here, the RFC determination is supported by substantial evidence . . . an attempt to bootstrap the same argument into Step Five should be rejected" and "relying on [the] RFC as the basis for question to the VE was not error.") (citations omitted).

Plaintiff also claims that the VE's testimony concerning the basis for the job numbers was contradictory because it was not entirely clear whether the job statistics were for jobs groups or discrete jobs.  (Dkt. No. 10 at 22.)  The VE's hearing transcript reflects that any confusion that existed was clarified when the ALJ asked the VE if the numbers he had given were for individual jobs, and the VE responded in the affirmative.  (T. 42.)

## VII.    CONCLUSION

Based upon the foregoing, the Court finds that the decision denying Plaintiff SSI benefits was arrived at through the correct application of legal standards is supported by substantial evidence.

**ACCORDINGLY**, it hereby

**ORDERED** that Plaintiff's motion for judgment on the pleadings (Dkt. No. 10) is **DENIED**; and it is further

**ORDERED** that Defendant's motion for judgment on the pleadings (Dkt. No. 11) is **GRANTED**; and it is further

**ORDERED** that Defendant's decision denying Plaintiff SSI benefits is **AFFIRMED**, and it is further

**ORDERED** that Plaintiff's complaint is **DISMISSED**.


Dated: March 19, 2019
          Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge